UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MIMS PROPERTIES, LLC, a Florida
limited liability company, MIMS
PROPERTIES INVESTMENTS, LLC,
a Florida limited liability company,
NICHOLS RANCH, LLC, a Florida
limited liability company, and MIMS/
ALAFIA, LLC, a Florida limited
liability company,

      Plaintiffs,

v.                                                                                       CASE NO.: 8:05cv2271-T26-EAJ

MOSAIC PHOSPHATES MP, INC.,
f/k/a IMC PHOSPHATES MP, INC., a
Delaware corporation; MOSAIC GLOBAL
OPERATIONS, INC., f/k/a IMC GLOBAL
OPERATIONS, INC., a Delaware
corporation; and PHOSPHATE
ACQUISITION PARTNERS LIMITED
PARTNERSHIP, a Delaware limited
partnership, all doing business as IMC
PHOSPHATES COMPANY, a Delaware
general partnership,

      Defendants.
_____/

**DEFENDANT'S MOTION FOR FINAL SUMMARY
JUDGMENT AND SUPPORTING MEMORANDUM OF LAW**

      Defendant, Mosaic Fertilizer, LLC ("Mosaic"), files this Motion for Final Summary Judgment, against Plaintiffs, Mims Properties, LLC, Mims Properties Investments, LLC, Nichols Ranch, LLC, and Mims/Alafia, LLC (collectively "Mims"), and states in support:

## BACKGROUND

Mosaic is a part of the Mosaic Company, a leader in producing and marketing fertilizer and livestock feed ingredients to the global agricultural industry. Mosaic serves customers in 50 countries through phosphate mine facilities in Florida. Mosaic currently operates four phosphate rock mines in South Central Florida.

Mosaic's predecessor, IMC Phosphates Company ("IMC"), owned the phosphate mineral interest at the recently closed Agrifos Nichols Mine, which mine encompassed the subject portion of Section 14 of Township 30 South, Range 23 East, in Polk County, Florida ("Section 14"), and which subject portion of Section 14 is the property pertinent to Plaintiff's claim.[1] Section 14 is shown on the attached aerial photograph/map prepared by Plaintiff's consultant. (Attached for convenience to this Motion as Exhibit 1; Hall Deposition Exhibit 19.) Though the sole portion of the easement at issue in this case is located on the southernmost area of Section 14 only, the original, entire easement is shown in pink on Exhibit 1 labeled "VIRGINIA-CAROLINA EASEMENT" and runs nearly the entire length of the map in generally an east-west direction. The segment of the original "VIRGINIA-CAROLINA EASEMENT" to the west of Section 14 is not at issue in this proceeding because it was effectively released by TECO when Mobil Oil Corporation ("Mobil"), a predecessor to IMC, granted a relocated utility easement to TECO on August 13, 1985. (See Davis deposition at p. 152, ln. 9-25; p. 153, ln. 22-25; and p. 154, ln. 1-3; Mims Composite Deposition Exhibit 30 at bates nbr. "Plaintiffs 0156.") Further, the segment of the original "VIRGINIA-CAROLINA EASEMENT" to the east of Section 14 (i.e. east of Highway 37) is not at issue in this proceeding because the segment is not

---

[1] Mosaic is the successor to IMC due to the merger of the business and assets of IMC into Mosaic in October 2004 (Krakowski deposition at p. 5, ln. 19-25; p. 6, ln. 1-8; p. 14, ln 10-19; p. 17, ln. 1-3), and on October 23, 2006, Mosaic admitted it was the proper party defendant in response to Interrogatory Nbr. 1 of Plaintiffs' First Set of Interrogatories.

2

owned by Plaintiffs. (Mims Deposition at p. 14, ln. 18-20 and p. 19, ln. 20-22.) Thus, the only relevant portion of the original "VIRGINIA-CAROLINA EASEMENT" at issue in this proceeding is the subject portion in Section 14. (Mims Deposition at p. 46, ln. 22-25 and p. 47, ln. 1-8.)

The legal issue is whether IMC held the right to invoke the relocation obligations imposed on Tampa Electric Company's ("TECO") electric transmission line easement, which relocation obligation is found in the Virginia-Carolina Chemical Corporation ("VCCC") grant of the utility easement attached as Exhibit A to the Complaint. (Plaintiffs' response to Interrogatory Nbr. 1 of Defendant's First Set of Interrogatories.) Plaintiffs claim IMC did not have the legal right to invoke the relocation obligation.[2] This motion explains why Plaintiffs are incorrect.

### *Phosphate Mineral Estate*

Initially, VCCC owned real property located in Polk County, Florida, including the subject portion of Section 14, in fee simple title to <u>both</u> (1) the surface estate (now owned by Plaintiff) and (2) the subsurface mineral estate (owned by IMC).

### *Easement with Tampa Electric Company Affecting Phosphate Mineral Estate*

On September 23, 1954, VCCC granted a utility easement to TECO for the purpose of constructing electric transmission lines, including poles or towers and all necessary appurtenances, which VCCC utility easement traversed Section 14. (See "Initial Easement Deed" attached to the Complaint as Exhibit A; Davis Deposition Exhibit 1; and also attached for convenience as Exhibit 2 to this Motion; note, Davis Deposition Exhibit 1 is both a copy of the

---

[2] Plaintiffs argue neither the IMC Mineral Deed nor the Control Area Easement Agreement ". . . give IMC the right to the relocation rights within the Virginia-Carolina easement." (Mims deposition at p. 27, ln. 7-14; 16-25, and p. 28, ln. 1.)

Initial Easement Deed and Davis' transcribed version of the body of the Initial Easement Deed into legible form due to the difficulty of reading the original document.)

The Initial Easement Deed reserved for the benefit of VCCC as grantor the right to have TECO relocate any electric transmission lines, including poles or towers and all necessary appurtenances, if necessary for mining of the phosphate minerals or other purposes related to mining of phosphate minerals located beneath the surface where the electric transmission lines are located. The exact language of the Initial Easement Deed states, in part:

> In the event Grantor [i.e. VCCC] should find it necessary to use said land or any portion thereof for mining or other purposes which would interfere or conflict with the use of the same by the Company [i.e. TECO], it may inform the Company of such decision and the Company will relocate the said installation....

(Motion Exhibit 2 at bates nbr. "Mosaic 0263.") The Initial Easement Deed also provided after the relocation right was invoked, TECO could chose to leave the electric transmission lines installation in place and reimburse the owner of the mineral estate for the value of the phosphate minerals remaining unmined. The exact language from the Initial Easement Deed states, in part:

> Should the Grantor, in the exercise of its said right, request the Company to relocate its transmission line...., the Company shall have the option of relocating...or...to leave the installation in its original location and reimburse the Grantor for the value of the phosphate rock remaining unmined because of the location of the line, such value to be mutually determined at the time.

(Motion Exhibit 2 at bates nbr. "Mosaic 0263.") Without question, the Initial Easement Deed's unambiguous and express terms regarding the right of grantor to invoke relocation of the electric transmission lines benefited the <u>subsurface phosphate mineral estate</u> exclusively.

### *Virginia Carolina Chemical Corporation's Transfer of Subsurface Phosphate Mineral Estate to Successors*

On December 26, 1963, VCCC merged with Socony Mobil Oil Corporation: the company name changed in 1966 to Mobil. (See Florida Department of State, Division of

4

Corporations records attached as Exhibit 3 to this Motion.)[3] Thus, Mobil was a successor to the surface estate, the subsurface phosphate mineral estate, and held the successor interest in the Initial Easement Deed. The parties to the Initial Easement Deed unambiguously stated their intent to invest the "successors" of Grantor (i.e. VCCC) with the same right to have TECO relocate the electric transmission lines installation if necessary to allow for mining of the phosphate minerals or other purposes related to mining. The Initial Easement Deed states, in part:

> Grantor (i.e. VCCC) . . . shall be construed to include the words "successors and assigns" of the respective parties . . .

(Motion Exhibit 2 at bates nbr. "Mosaic 0263.") In sum, Mobil, as well as all successors to VCCC, including ultimately IMC, enjoyed the benefit of the right to invoke the relocation clause of the Initial Easement Deed.

On August 13, 1985, Mobil granted a utility easement to TECO to construct electric transmission lines from the western boundary of Section 14 and extending further west to Section 19. (Mims Composite Deposition Exhibit 30 at bates nbr. "Plaintiffs 0156.") The electric transmission line poles are apparent in this utility easement on the photograph/map (Motion Exhibit 1). This Mobil easement is shown in orange on the Motion Exhibit 1 map, and necessarily resulted in the effective release of the "VIRGINIA-CAROLINA EASEMENT" in the segment west of the subject portion in Section 14. The 1985 Mobil easement to TECO does not contain a relocation rights provision.

On April 8, 1996, Mobil conveyed its successor fee interest to the surface estate, the subsurface phosphate mineral estate, and successor interest in the Initial Easement Deed, which included Section 14, to Agrifos L.L.C. (Mims Deposition Exhibit 32; recorded in Official

---

[3] See Fed. R. Evid. 803(8).

5

Records Book 3661, Page 0874 of the public records of Polk County, Florida.)[4] None of the prior interest holders, VCCC, Mobil, nor Agrifos L.L.C., ever mined the phosphate mineral estate under the TECO electric transmission line easement in Section 14 or exercised the right to have TECO relocate the electric transmission lines in Section 14.

On December 3, 2002, Agrifos Mining L.L.C. (f/k/a Agrifos L.L.C.) granted to IMC the <u>subsurface phosphate mineral estate</u> to mine the phosphate minerals and ". . . ownership of all phosphate, phosphate rock, and phosphatic substances in and under the 'Reserve Lands' . . . and to use the surface and subsurface of the Reserve Lands in any manner required or convenient in connection with mining . . ." which Reserve Lands encompassed the subject portion of Section 14. (See IMC Mineral Deed attached as Exhibit B to the Complaint; Davis Deposition Exhibit 2; and also attached for convenience to this Motion as Exhibit 4, at bates nbr. "Mosaic 0077".) Plaintiffs concede at paragraph 12 of the Complaint IMC was granted the right to mine the subsurface phosphate mineral interest.

IMC, as VCCC's successor, held the subsurface phosphate mineral estate and ownership of all phosphate in and under the subject TECO electric transmission line easement. The IMC Mineral Deed specifically granted the phosphate mineral estate to IMC subject to the TECO electric transmission line easement as a "Permitted Exception," further evidencing IMC as a successor to VCCC under the Initial Easement Deed, which created the electric transmission line easement. IMC was both a successor to the subsurface phosphate mineral estate originally owned by VCCC and a successor to the right VCCC reserved for itself and its successors under the Initial Easement Deed to request a relocation of the TECO electric transmission lines in Section 14 in order to allow for mining.

---

[4] See Fed. R. Evid. 803(8).

On December 3, 2002, concurrent with the IMC Mineral Deed, Agrifos L.L.C. and IMC entered into the IMC Control Area Easement Agreement, which included the subject portion of Section 14. (See IMC Control Area Easement Agreement attached as Exhibit C to Complaint; Davis Deposition Exhibit 3; and also attached for convenience to this Motion as Exhibit 5.) The parties entered this agreement "[t]o facilitate IMC's use, development, and exploitation of its [i.e. IMC's] Mineral Interest . . . the parties desire to create various easements and rights in favor of IMC." (Motion Exhibit 5 at bates nbr. "Mosaic 0006-0007.") Significantly, this agreement also recognized IMC's right to request a relocation of any electric transmission lines interfering with mining activities. The agreement states, in part:

> Agrifos . . . grants IMC easements and rights of access . . . for purposes of allowing IMC to undertake and complete mining . . . and to perform other activities incidental thereto . . . . Such easements and rights include, without limitation, the right to . . . relocate . . . electric transformers and transmission lines . . . .

(Motion Exhibit 5 at bates nbr. "Mosaic 0007," ¶ 1.(a).)

### *IMC Exercised Right Concerning Relocation of TECO Electric Transmission Line*

Early in 2003, IMC informed TECO it was exercising its right under the Initial Easement Deed and the IMC Control Area Easement Agreement to relocate the electric transmission lines in order for IMC to mine the phosphate reserves (Davis deposition at p. 73, ln. 14-16; Krakowski deposition at p. 21, ln. 20-23; Davis Deposition Exhibit 10). TECO's legal department independently confirmed IMC held such relocation rights. (See T. Hernandez deposition at p. 21, ln. 11-18., p. 23, ln. 9-25 and p. 24, ln. 1-16.; T. Hernandez Deposition Exhibit 45 at p. 22, bullet item 7). TECO then exercised its option, as discussed above, to reimburse IMC instead of relocating the power lines based on the value of the unmined phosphate rock as mutually determined. (Krakowski deposition at p. 21, ln. 24-25 and p. 22, ln. 1-11.) The reimbursement

agreement was executed between TECO and IMC on December 19, 2003, in a Release and Satisfaction of Relocation Obligations ("Satisfaction of Relocation"). (See Satisfaction of Relocation attached to Complaint as Exhibit D; Krakowski deposition at p. 19, ln. 17-22 and p. 27, ln. 3-23; Davis Deposition Exhibit 17.)

### *Surface Estate Ownership*

Prior to IMC exercising its right to invoke the relocation provision in order to mine the phosphate mineral estate, Plaintiffs acquired fee ownership of the <u>surface</u> estate (though not presently the subsurface phosphate mineral estate) which included the subject portion of Section 14. (Complaint at ¶10.) Indeed, on the same day IMC executed the IMC Mineral Deed and IMC Control Area Easement Agreement with Agrifos L.L.C., Agrifos L.L.C. conveyed to Mims/Alafia, LLC, one of the Plaintiffs in this action, portions of the surface estate in Section 14 (among other parcels) in fee simple.[5] (Mims deposition at p. 101, ln. 21-24, p. 102, ln. 4-7; Mims Deposition Exhibit 29 at bates number "Plaintiffs 0021-0026;" and attached for convenience to this Motion as Exhibit 6.) As stated in Plaintiffs' Special Warranty Deed, this conveyance to Plaintiffs was subject to the reservations and covenants and matters set forth on the "Permitted Exceptions"[6] which expressly excepted the:

> IMC Mineral Deed dated on or about the date of this Deed executed by Grantor (i.e. Agrifos) . . . in favor of IMC Phosphates Company ("IMC") and IMC Control Area Easement Agreement dated on or about the date of this Deed and executed by Grantor (i.e. Agrifos) and IMC . . .

---

[5] This conveyance was pursuant to a confirmed plan of reorganization of Agrifos pursuant to Section 1129 of the Bankruptcy Code.

[6] Permitted Exception means the grantor withholds from grant the title to some part of property which would otherwise pass . . . [or, in other words] excludes from operation of grant some existing part of estate." <u>Black's Law Dictionary</u> (5th Ed. 1979) at 502, 503; *See also, Lewis v. Standard Oil*, 88 F.2d 512, 514 ("An exception is always of some part of the estate not granted at all.")

8

(See "Exhibit B Permitted Exceptions" to Motion Exhibit 6 at bates nbr. "Plaintiffs 0026.") Plaintiffs admit that by virtue of the IMC Mineral Deed, ". . . IMC has rights to the minerals underneath the areas that are within the mineral deed area for a specific period of time." (See Mims deposition at pg. 104, ln. 16-19.)

## LEGAL ARGUMENT

As the next section explains, Plaintiffs' Complaint is without legal merit because: (a) Plaintiffs' owned the surface estate and IMC owned the subsurface phosphate mineral estate; (b) IMC's subsurface phosphate mineral estate is legally dominant over Plaintiffs' surface estate; (c) the Plaintiffs' surface estate interest is without standing to enforce the covenant benefiting IMC as the owner of the subsurface phosphate mineral estate; and (d) IMC did not disparage Plaintiffs' title to its property.

A.  Once Separated, the Surface and Subsurface Estates Are Owned Independently

The Plaintiffs' surface estate is a separate and distinct estate from the Defendant's subsurface phosphate mineral estate, and the owner of the surface estate cannot encumber the rights of the subsurface owner. Under Florida law, "[w]hen the surface estate and mineral estate are severed, they remain independent. Possession of one does not carry with it possession of the other." *Trustees of Tufts College v. Triple R. Ranch, Inc.*, 275 So. 2d 521, 525-26 (Fla. 1973). *See also Noblin v. Harbor Hills*, 896 So. 2d 781, 783 (5th DCA 2005) ("The general rule . . . provides that a reservation or . . . grant of mineral rights reflects an intent on the part of the parties to sever the surface estate from the underlying mineral estate and create two separate

9

estates.")[7] In *Tufts*, a successor to the surface estate sought to apply a Florida statutory provision[8] to clear a reservation of mineral rights in a deed. The successor to the subsurface mineral estate filed a motion to dismiss and for judgment on the pleadings, which motions were denied by the trial court. However, the Florida Supreme Court reversed the trial court order denying the motion to dismiss and the motion for judgment on the pleadings, and remanded with directions to dismiss the surface estate owner's complaint. The Florida Supreme Court in *Tufts* recognized subsurface mineral rights as "a valuable property interest." *Id.* at 526. The Supreme Court also noted the Florida legislature's similar recognition that "severed mineral rights constitute a valuable vested property interest" as such subsurface mineral estates are an interest subject to taxation. *Tufts* at 526. Thus, when Agrifos L.L.C. conveyed its interest in the subsurface phosphate mineral estate to IMC, both being successors to VCCC and Mobil, and the surface estate to Plaintiffs, two independent estates were created: the Plaintiffs' surface estate and the Defendant's subsurface phosphate mineral estate.

B.     The Subsurface Phosphate Mineral Estate Is the Dominant Estate.

As the First District correctly explained the rule in *P & N Investment Corp. v. Florida Ranchettes, Inc.*, 221 So. 2d 451 (Fla. 1st DCA 1968):

---

[7] The majority of jurisdictions in the country are in accord with Florida on this issue. *See, e.g., Nevada Irrigation Dist. v. Keystone Copper Corp.*, 36 Cal. Rptr. 775, 778 (1964) ("The owner of real property may divide his lands horizontally as well as vertically, and when he conveys the subsurface mineral deposits separately from the surface rights, or reserves them from a conveyance of such surface rights, he creates two separate fee simple estates in the land . . ..") (citations omitted); *Jilek v. Chicago, Wilmington & Franklin Coal Co.*, 47 N.E.2d 96, 98 (Ill. 1943) ("It has long been recognized in this State that mineral rights may be severed from the surface rights and conveyed separately, and that two estates are thus created in the land, each of which is distinct, and each of which may be conveyed or devised, and each is subject to taxation.") (citations omitted); *Groves v. Terrace Mining Co.*, 340 S.W.2d 708, 710 (Mo. 1960) ("The owner of land containing minerals may segregate the surface rights from the underlying minerals by a conveyance in writing so that there is a complete severance of title and separate estates are created.") (citations omitted).

[8] *See* § 193.481(1), Fla. Stat. (2006) ("Whenever the mineral, oil, gas, and other subsurface rights in or to real property in this state shall have been sold or otherwise transferred by the owner of such real property,...such subsurface rights shall be taken and treated as an interest in real property subject to taxation separate and apart from the fee or ownership of the fee or other interest in the fee.").

> [T]he weight of authority in this country, especially in the major oil-producing states, is as follows: When the surface estate is severed from the mineral estate, *the mineral estate is the dominant estate* and, therefore, the owner of the mineral estate has the right to remove the minerals.

*Id.* at 453 (emphasis added). *Accord Trustees of Tufts College*, 275 So. 2d at 526 ("when the surface estate is severed from the mineral estate, the mineral estate is dominant . . .."); *Noblin v. Harbor Hills Dev., L.P.*, 896 So. 2d 781, 784 (Fla. 5th DCA 2005); *Flying Diamond Corp. v. Rust*, 551 P.2d 509, 511 (Utah 1976) ("The general rule which is approved by all jurisdictions that have considered the matter is that the ownership (or rights of a lessee) of mineral rights in land is dominant over the rights of the owner of the fee to the extent reasonably necessary to extract the minerals therefrom.") (footnote omitted). "[A]n owner of an interest in minerals is entitled to enter the land and explore for minerals without liability to the surface owner as long as injury to the surface is reasonable." *Hill v. Bridgers*, 397 So. 2d 1212, 1214 (Fla. 2d DCA 1981). *Accord Rocky Mountain Fuel Co. v. Heflin*, 366 P.2d 577, 580 (Colo. 1961) ("The owner of a mineral estate has rights of ingress, egress, exploration, and surface usage as are reasonably necessary to the successful exploitation of his interest.") (citations omitted); *Phillips v. Fox*, 458 S.E.2d 327, 332 (W. Va. 1995) ("It is well-settled that ownership of a mineral estate includes the right to enter upon and use the superjacent surface by such manner and means as is fairly reasonable and necessary to reach and remove the minerals.") (citations omitted). Thus, when Agrifos L.L.C. granted its interest in the subsurface phosphate mineral estate to IMC, thereby severing Plaintiffs' surface estate from the subsurface estate, the subsurface estate became the dominant estate.

The absolute intention of the grantors and grantees of the subsurface phosphate mineral estate (from the original Grantor, VCCC, through Mobil to Agrifos L.L.C. and ultimately to IMC) was to reserve the right to receive the full benefit of the phosphate mineral estate, not only

the entitlement to mine the phosphate minerals but all other rights and privileges in connection with mining, including the right to relocation of TECO's electric transmission lines. *See Jilek*, 47 N.E.2d at 100 ("When the mineral estate is severed from the surface estate that with the mineral estate all means to attain it are also granted for the purpose of enjoying it. This is because it is presumed the grantor intended to convey, and the grantee expected to receive, the full benefit of the mineral estate, and therefore the grantor not only conveyed the thing specifically described, but all other rights and privileges necessary to the enjoyment of the thing granted.") (citations omitted); *See also, Lewis*, 88 F.2d at 514 ("To determine whether a reservation or an exception has been made, we must look to the substance of the right excepted or reserved, and make an independent determination, regardless of how the right is termed in the instrument . . .. In construing the instrument, 'the intention of the parties, is to be pursued, if possible'.") (citations omitted). Plaintiffs admit in paragraph 12 of the Complaint the IMC Mineral Deed gave IMC the right to mine phosphate minerals in subject portions of Section 14.

Because the subsurface phosphate mineral estate is separate and distinct from the surface estate and because the subsurface estate is the dominant estate, IMC at the time it held the rights to the subsurface phosphate mineral estate exclusively enjoyed the legal right to invoke the relocation right concerning TECO's electric transmission line easement in order to mine the phosphate minerals or, as provided for in the Initial Easement Deed, accept TECO's payment to IMC for the value of the phosphate minerals located under the easement in lieu of the relocation of the electric transmission lines.

  C. <u>Plaintiffs' Attempt at Equitable Enforcement of a Real Covenant Must Fail Because Such Suit is Maintainable Only by the One for Whose Benefit the Covenant Was Intended</u>

"The general theory behind the right to enforce restrictive covenants, is that the covenants must have been made with or for the benefit of the one seeking to enforce them." *Osius v. Barton*, 147 So. 862, 865 (Fla. 1933). The Initial Easement Deed was created, in part, for the benefit of successors of VCCC to the phosphate mineral rights. TECO's payment in lieu of relocating its electric transmission lines is based on the value of unmined phosphate mutually determined by IMC and TECO and can only be intended to relate to or benefit the subsurface phosphate mineral estate. The Plaintiffs' suit for equitable enforcement of the relocation provision of the Initial Easement Deed must fail because the surface estate owner was not one for whose benefit the covenant was intended. Since the restrictive covenant in the instant case was created for the intended benefit of the existing subsurface phosphate mineral estate, at the time held by IMC, it can only be enforced by the subsurface phosphate mineral estate owner, IMC. Thus, Plaintiff has no standing to enforce.

  D. <u>Plaintiff's Slander of Title Claim Must Fail because IMC Did Not Intentionally or Maliciously Disparage Title to Plaintiff's Property</u>

Plaintiffs allege IMC slandered Plaintiff's title to the surface estate. "Slander of title is the wrongful, intentional and malicious disparagement of vendibility of title to real property." *Atkinson v. Fundaro*, 400 So. 2d 1324, 1325 (Fla. 4th DCA 1981). *See also Old Plantation Corp. v. Maule Industries, Inc.*, 68 So. 2d 180, 181 (Fla. 1953); *McDonald v. McGowan*, 402 So. 2d 1197, 1200 (Fla. 5th DCA 1981).

As asserted in IMC's affirmative defenses, IMC executed the Satisfaction of Relocation on December 19, 2003, in good faith and without malice, believing full well it held the legal phosphate mineral interest in the subsurface estate. (Krakowski deposition at p. 21, ln. 17-23.)

IMC's subsurface estate was separate and independent from the Plaintiff's surface estate, and IMC did not have any legal obligation to Plaintiffs concerning executing the Satisfaction of Relocation. (Krakowski deposition at p. 25, ln. 10-17.) Because IMC executed the Release in good faith and without malice, the difficult burden falls upon Plaintiffs to establish actual malice. *See Residential Communities of America v. Escondido Community Assoc.*, 645 So. 2d 149, 150 (Fla. 5th DCA 1994) ("If a defendant establishes a defense of good faith, or other privilege, however, a plaintiff must prove actual malice.").

Plaintiff can prove no set of facts to establish IMC acted with actual malice either in executing or when TECO recorded the Satisfaction of Relocation. In fact, all IMC did was to invoke its relocation rights. TECO requested a letter and release from IMC, and TECO recorded it in the official records of Polk County. (Hernandez deposition at p. 16, ln. 1-19, and p. 20, ln. 9-22; Davis Deposition Exhibit 17.) Such actions by IMC constitute neither actual malice nor slander of title. "[P]rotecting one's rights by recording a contract does not constitute slander of title." *Domres v. Perrigan*, 760 So. 2d 1028, 1030 n.1 (Fla. 5th DCA 2000) (citing *McDonald v. McGowan*, 402 So. 2d 1197 (Fla. 5th DCA 1981)). Accordingly, Plaintiff's sole cause of action brought in the slander of title claim fails.

## CONCLUSION

Because IMC held the subsurface phosphate mineral estate independently and IMC's subsurface phosphate mineral estate is the dominant estate, Plaintiffs cannot assert a present right to the relocation provision of the Initial Easement Deed. Plaintiffs cannot assert a cause of action for equitable enforcement of the covenant concerning relocation rights. IMC did not maliciously disparage title to Plaintiffs' surface estate. Thus, Defendant requests this Court enter

a final summary judgment in favor of Defendant and for such other relief the Court finds appropriate.

Respectfully submitted,

**s/ Rory C. Ryan**
Rory C. Ryan
Florida Bar No. 862010
Andrew P. Lannon
Florida Bar No. 648140
Attorneys for Defendants
HOLLAND & KNIGHT LLP
200 S. Orange Avenue, Suite 2600
P.O. Box 1526
Orlando, FL 32802-1526
Telephone: 407-425-8500
Fax: 407-244-5288
E-mail: rory.ryan@hklaw.com

James K. Voyles
The Mosaic Company
5000 Old Highway 37 South
Mulberry, FL 33860
Telephone: 863-428-6482
Fax: 863-428-2643
E-Mail: james.voyles@mosaicco.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 2, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses: jsbar@rmslegal.com; rvalles@rmslegal.com; and rocke@rmslegal.com. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: (None indicated.)

               s/ **Rory C. Ryan**
               Rory C. Ryan
               Florida Bar No. 862010
               Andrew P. Lannon
               Florida Bar No. 648140
               Attorneys for Defendants
               HOLLAND & KNIGHT LLP
               200 S. Orange Avenue, Suite 2600
               P.O. Box 1526
               Orlando, FL  32802-1526
               Telephone:  407-425-8500
               Fax:  407-244-5288
               E-mail: rory.ryan@hklaw.com

# 3597379_v1